Exhibit A
Deposition of Dan Hollings

Q.   Who told you about the concept of the movie?

A.   Rhonda Byrne.

Q.   Okay.  You suggested that there were products available on the web site for The Secret; is that correct?

A.   Correct.

Q.   Did you receive instructions from anyone on what products to make available on that site?

A.   No.

Q.   You had sole discretion to choose what products to put on the web site?

A.   No.  I offered up suggestions to them about additional products.

Q.   Who is "them"?

A.   Rhonda Byrne and Paul Harrington.

Q.   Did you ever offer suggestions to Bob Rainone?

A.   Couple of months after I came on board, Bob Rainone joined the company and, at that point, I shared with him the products and services that I had already introduced to Rhonda and Paul.

Q.   How did you share those with him?  And I guess I should be clearer.  I mean by what medium did you share those?  Did you speak to him in person, did you send an e-mail?

          MR. PARKER:  Counsel, with whom?

          MR. CEDILLO:  Excuse me?

1         MR. PARKER:  You said "with him."  Can you

2   identify the "him"?

3         MR. CEDILLO:  Bob.

4         THE WITNESS:  With Bob?

5   BY MR. CEDILLO:

6       Q.   Yes.

7       A.   Primarily e-mail.

8       Q.   Did he ever respond to your e-mails?

9       A.   Yes.

10      Q.   Did he usually respond to your e-mails?

11      A.   Define "usually."

12      Q.   However you would like.

13      A.   He usually did.

14      Q.   Did you ever phone Bob?

15      A.   Occasionally.

16      Q.   Do you know what his phone number is?

17      A.   By memory, no.

18      Q.   Okay.  Did you ever address these issues with

19  Bob in person?

20      A.   What issues?

21      Q.   You described that you discussed content,

22  products, for example, with him by e-mail, by phone

23  occasionally in the first a couple of months after you had

24  arrived and he arrived?

25      A.   Uh-huh.

1      Q.   The same topics you discussed then, did you ever

2   discuss with him in person?

3      A.   No.

4      Q.   Never?

5      A.   Never.

6      Q.   Do you know where Bob Rainone was when you sent

7   e-mails to him?

8      A.   I'm not sure.  It varied.

9      Q.   Okay.  Do you know if he ever resided in Chicago

10   during the time that you were sending e-mails to him?

11      A.   Yes.  He told me he resided in Chicago.

12      Q.   Did you ever express any objection to dealing

13   with him because he lived in Chicago?

14      A.   No.

15      Q.   Did his residing in Chicago cause you to limit

16   the number of e-mails you sent to him?

17      A.   No.

18      Q.   Did it cause you to limit the number of phone

19   calls you made to him?

20      A.   No.

21      Q.   Were you ever -- in the course of the services

22   that you provided to The Secret, did you ever engage

23   Google in any of its services?

24      A.   Yes.

25      Q.   Can you describe what those were?

Q.    Did you use your own funds to make those payments?

A.    I did.

Q.    Were you ever reimbursed for those?

A.    I was.

Q.    By whom?

A.    I would invoice and then that would come back from The Secret.

Q.    So you would invoice The Secret for expenses connected with the services that you were hired to provide?

A.    That is correct.

Q.    Where did you send those invoices?

A.    The first invoice that I sent to The Secret was sent to PrimeTime in Australia.  And then after that they were sent to Bob.

Q.    And where was Bob?

A.    Well, the invoices were done online, I wasn't physically mailing them, so I'm not sure where Bob was.

            MR. CEDILLO:  Can we go off the record for a second, please?

            (Discussion took place off the record.)

            (Exhibit Number 1 was marked for identification.)

BY MR. CEDILLO:

1    services during the rest of your time working for The

2    Secret?

3         A.    Yes.   I invoiced monthly.

4         Q.    Every month?

5         A.    Every month.

6         Q.    Until approximately February 2007?

7         A.    Correct.

8         Q.    Did any of your invoices not include a Chicago

9    address for The Secret?

10        A.    The first one went to PrimeTime, Rhonda Byrne,

11   in Australia.

12        Q.    Did any of the invoices, from Invoice 00002

13   through the last one you sent, have an address other than

14   Chicago?

15        A.    I can't recall the addresses on all of the

16   invoices.

17              (Exhibit Number 3 was marked for

18   identification.)

19   BY MR. CEDILLO:

20        Q.    This is a document Bates labeled TS 00014.   Can

21   you describe the document, please.

22        A.    It's an invoice from me to The Secret LLC.

23        Q.    Does it have a Chicago address for The Secret?

24        A.    Yes, it does.

25        Q.    It contains a line item described as

1    When you said I was working for them, I was never employed

2    by them, I was consulting for them.

3         Q.   Providing services to them?

4         A.   Yes.

5         Q.   Okay.

6         A.   So now back to this question.

7         Q.   So you had been providing services to them for

8    about a year at that point?

9         A.   Correct.

10        Q.   Okay.  And even a year later, your invoice --

11   strike that.

12             You drafted this invoice; correct?

13        A.   Yes.

14        Q.   Like the others?

15        A.   Yes.

16        Q.   And a year later, you were still including the

17   Chicago address for The Secret LLC; is that correct?

18        A.   Yes.

19        Q.   Okay.  You stated that these invoices generally

20   were paid; is that accurate?

21        A.   Yes.

22        Q.   How were they paid to you?  For example, were

23   you sent a check, were you wired money?  How were these

24   invoices paid to you?  How did you receive the funds?

25        A.   The first invoice was wired.

1     Q.    Okay.

2     A.    From Australia.  And my recollection is that

3 future payments came by check.

4     Q.    Always?

5     A.    Always check.

6     Q.    Do you recall if those checks contained an

7 address for the account holder?

8     A.    I can't recall what was on the checks.

9     Q.    You cashed them?

10     A.    Yes.

11     Q.    I'm handing you a document labeled TS 00024,

12 which will be Exhibit 10.

13     (Exhibit Number 10 was marked for

14 identification.)

15 BY MR. CEDILLO:

16     Q.    Can you describe this document, please.

17     A.    It looks like a photocopy of a handwritten

18 check.

19     Q.    Do you see in what appears to be the memo line

20 on the check some writing there?

21     A.    Yeah.  Barely, yes.

22     Q.    Can you make that out, to the best of your

23 ability?

24     A.    There's a word and then after that numbers.  The

25 number is 00006.

Prepared exclusively for the Defendants (p. 2)

4

1       A.    Based on what I see here, they were sent to 1550

2   North Cleveland Avenue, Chicago, Illinois 60010.   Whereas

3   earlier, we had 1339 West George Street, Chicago, Illinois

4   60657.

5       Q.    Okay.

6       A.    And prior to that, we had Australia.

7       Q.    But from at least November 2005 through February

8   2007, you were sending invoices to a Chicago address; is

9   that correct?

10      A.    I believe so.

11      Q.    And these invoices were paid?

12      A.    They were paid.

13      Q.    And they were paid by check like Exhibit 10; is

14  that right?

15      A.    I was paid by check.  Except for the first one

16  which was wired.

17      Q.    Okay.  But the others were paid by check?

18      A.    Correct.

19      Q.    Do you recall if the checks, besides Exhibit 10,

20  also contained a -- also bore a Chicago address for the

21  payer?

22      A.    I have no idea.

23      Q.    Okay.  You mentioned that you established Web

24  Services at the recommendation of someone; is that right?

25      A.    That's correct.

Q.   Who was that?

A.   Bob Rainone.

Q.   Is that something you considered before Bob recommended it?

A.   No.

Q.   I'm handing you a document labeled TS 00009.

(Exhibit Number 12 was marked for identification.)

BY MR. CEDILLO:

Q.   Can you identify the document, please?

A.   It appears to be a photocopy of an e-mail from me to Bob Rainone dated September 7th, 2006 regarding subject line S Corp./LLC.

Q.   Can you read the text of the first paragraph after Bob?

A.   "I have now set up an LLC/S Corp. for myself," parenthetically, "again, thanks for nudging me along on this. It was something I always wanted to do but never got around to it."

Q.   So you had considered it before Bob recommended it to you?

A.   I had thought about it before, but I never really had any reason to do it.

Q.   It says, "It was something I always wanted to do." Is that what it says?

EXHIBITS

1   allegations relating to this CD, but I don't see how that

2   question gets to any jurisdictional issue.  You can ask

3   him where he sent them, which you've done.  But the

4   purpose behind it, I fail to see how it's relevant to the

5   inquiry we're here for today.

6           MR. CEDILLO:  Okay.  Can you repeat the last

7   question.

8           (Question read.)

9           MR. PARKER:  Same objection.  Absent some tie

10  into any of the jurisdictional issues, I'm going to

11  instruct him not to answer.

12  BY MR. CEDILLO:

13      Q.  You're confident that you never sent any CDs to

14  Chicago?

15      A.  I'm absolutely sure of that.

16      Q.  Did you ever travel to Chicago in connection

17  with your work for The Secret?

18      A.  One time.

19      Q.  Approximately when?

20      A.  Very near the end of my consultation with The

21  Secret.  I believe in December of 2006.

22      Q.  And what about your work for The Secret brought

23  you there?

24      A.  Bob Rainone had requested I come for a meeting

25  there that he was orchestrating.

1    Q.    What was the meeting about?

2    A.    Future plans of where The Secret would be going

3  in the coming year, what they would be doing.

4    Q.    Why did you need to be there?

5    A.    You would have to ask Bob Rainone that.

6    Q.    Why did you go?

7    A.    Pardon me?

8    Q.    Why did you go?

9    A.    Because I was providing services for them as a

10 client and expected to continue to provide services and

11 Bob said that we would be talking about things that we

12 would be doing in the coming year, so it behooved me to

13 accept his invitation.

14   Q.    So it was related to the work that you had been

15 doing for The Secret?

16   A.    Yes, it was related to work for The Secret.

17   Q.    Did you, in fact, draft an agenda for that

18 meeting in December of 2006 in Chicago?

19   A.    I think I sent an e-mail suggesting some topics

20 and things that I would like to see included in the

21 agenda, but I believe that Bob actually drafted the

22 agenda.

23   Q.    But you made your suggestions?

24   A.    Yes, I made suggestions.

25   Q.    Did you object when Bob told you that you needed

EXHIBITS

1   to come to Chicago for this meeting as distinguished from

2   somewhere else?

3        A.   Actually, I did, yes.

4        Q.   But you went anyway?

5        A.   I went anyway.

6        Q.   No one forced you to go, did they?

7             MR. PARKER:  Object to the form.

8             You can answer it, if you can.

9             THE WITNESS:  That's an unusual question.  I

10  felt obligated to go in order to provide services for the

11  client.

12  BY MR. CEDILLO:

13       Q.   And ultimately, it would be to your benefit if

14  you went; correct?

15            MR. PARKER:  Same objection.

16            THE WITNESS:  There was nothing covered in the

17  meeting that couldn't have been done by telephone or

18  e-mail.

19  BY MR. CEDILLO:

20       Q.   But you went anyway?

21       A.   I went anyway.

22       Q.   Just to wrap up, you named three cell phone

23  numbers at the beginning of the deposition.

24            MR. PARKER:  Cell phone or phone numbers?

25            MR. CEDILLO:  I'm sorry.  Thank you.